BARNES, J.,
 

 for the Court:
 

 ¶ 1. A Rankin County Circuit Court jury found Jason Johnson guilty of shooting into a dwelling house. The trial judge sentenced Johnson to ten years in the custody of the Mississippi Department of Corrections (MDOC). Johnson now appeals his conviction and sentence, challenging the weight and sufficiency of the evidence as to the element of willfulness. Finding no error, we affirm.
 

 STATEMENT OF FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. On the afternoon of May 22, 2005, the victim, Kankalelus “Ken” Aldridge, arrived at a trailer on Lawrence Road in Rankin County. He was returning his two-year-old twin children to their mother, Tyana Taylor, who lived in the trailer with her children, grandmother, mother, and brother. After Aldridge took his sleeping children into the trailer one by one, he went back outside to his vehicle and saw another vehicle pull up; the vehicle was occupied by “three guys.” Aldridge testified that one of the men, Sergio Watson,
 
 [1]
 
 came up to him as he was standing inside his open driver’s side door and said “give it up.”
 

 
 *402
 
 ¶ 3. Aldridge testified that Watson punched him in the face, while another man, later identified as Marcus Divine, struck Aldridge with a baseball bat. Meanwhile, a third man called “Cook,” later identified as Johnson, who is Watson’s brother, “came with a rifle, [and] had the rifle aimed at [Aldridge’s] face.” Aldridge said the three individuals stole his hat, car keys, and approximately $80 in cash from his pocket. Aldridge claims he heard Taylor’s mother, Jennifer Stokes, standing near the front door, pleading to Johnson, “don’t shoot,” as the gun fired twice. Aldridge “was continuing to struggle, trying to avoid getting shot, using the other guy as kind of a shield to block the gun from shooting [him].” The three men then departed in their vehicle. Stokes invited Aldridge into the trailer to wait for the police. When law enforcement arrived, Aldridge recounted what had happened and then went to the hospital for treatment of his injuries from being hit with the bat. Aldridge’s car keys were found, but his money and hat were never recovered.
 

 ¶ 4. Raymond Duke, a deputy with the Rankin County Sheriffs Department, arrived after receiving a report about “trespassing with shots fired at a property on Lawrence Road.” Deputy Duke testified that Aldridge, who was still on the scene, told him “he had been physically assaulted, robbed, and shots were ... actually fired into a residence.” Aldridge also told Deputy Duke that his vehicle’s windshield had been burst out when he had dodged an attempted blow to his head with a bat. Aldridge had been robbed of “his ball cap and eighty dollars in cash.” Deputy Duke also interviewed Taylor, her sister, and their mother, Stokes. These three witnesses all corroborated what Aldridge had reported: that Johnson was the individual with the firearm. At trial, responding to the district attorney’s query as to whether he had observed anything at the scene to indicate that shots had been fired, Deputy Duke answered:
 

 Yes, sir. The grandmother was actually standing in the doorway when the assault occurred, and advised that a round had struck the trailer. And I did locate, just to the right of the door, about halfway, the middle height of the door, what appeared to be a projectile entry into the side of the trailer.
 

 He also found one spent .22 cartridge in front of the trailer where Aldridge’s vehicle had been parked during the altercation.
 

 ¶ 5. Deputy Tim Lawless, who also had investigated the incident, testified that he personally observed a hole in the trailer; the witnesses informed him that the hole was not there before the incident in question. The witnesses stated that was where one of the bullets had struck the residence. He attempted to dig the bullet from the vinyl siding of the trailer, but the bullet could not be located. Subsequently, Deputy Lawless conducted two interviews with Johnson. In the first statement, Deputy Lawless testified that Johnson said the three men (Watson, Devine, and Johnson) went to the trailer to buy some marijuana, but when they arrived, they decided they were going to rob Aldridge of the drugs and money instead. Deputy Lawless testified that in Johnson’s second statement, while Johnson denied owning a gun and shooting at anybody during the incident, he admitted again that he, Watson, and Devine “did go down with the plans of robbing the victim, Mr. Ken Aldridge.” Deputy Lawless testified that Johnson stated Devine had pointed the gun at Al-dridge and fired it; however, Deputy Lawless noted that none of the other witnesses implicated Devine in the shooting.
 

 ¶ 6. At trial, Stokes recounted the incident as follows:
 

 
 *403
 
 Well, a loud noise woke me up because I had worked that night, and I was resting, and noise woke me up. So when I went outside, that’s when Ken’s, his car, his door was open, and Sergio had him like straddled the door ... and they was tussling. And Cook [Johnson] had a gun.... And I told him, don’t shoot that gun. And he still shot, but he missed Ken, and he hit our trailer. And my mom and my grand babies was [sic] standing in that door when that bullet hit it.
 

 [[Image here]]
 

 He was pointing, I was screaming. I was telling him to stop, and he still shot that gun.
 

 Stokes testified that Johnson shot the rifle twice. She identified a hole in the siding of the trailer, which had not been there before, that she thought was caused by one of the bullets shot by Johnson.
 

 ¶7. Johnson, testifying at trial in his own defense, stated that Aldridge was the individual who had shot the firearm, which caused the hole in the trailer. Johnson recounted that Aldridge telephoned him and asked to speak to Watson; therefore, Johnson “put the phone on speaker” and heard Aldridge tell Watson that he was returning his twins to Taylor and asked whether Watson “need[ed] anything.” Watson requested that Aldridge bring him about one hundred dollars’ worth of marijuana. Aldridge directed Watson to come to the trailer on Lawrence Road; so Johnson drove Watson and Divine there. Johnson initially observed Watson and Al-dridge having a friendly conversation, and Aldridge “pulled out a sack of marijuana.” However, then Watson and Aldridge began fighting. Aldridge “ran to his car and grabbed a gun” while Devine, in an attempt to rid Aldridge of the firearm, hit Aldridge with a bat. Johnson stated that Aldridge dropped the gun; so he grabbed it. Johnson recounted that, at this point, Stokes came out of the trailer and saw him with the firearm. Johnson stated he was going to take the clip out of the firearm when Aldridge tried to snatch the gun, and it accidentally fired one time into the air. Johnson, Watson, and Devine then left the scene. Johnson denied telling Deputy Lawless about a plan to rob Aldridge, or that he had earlier stated Devine had the rifle. Johnson maintained he “told [Lawless] exactly what had went on.”
 

 ¶ 8. After a jury trial, Johnson was acquitted of Counts I and II, armed robbery and aggravated assault with a bat,
 
 [2]
 
 but he was convicted of Count III, shooting into a dwelling house. The trial court sentenced Johnson to ten years in the custody of the MDOC and ordered him to pay a $10,000 fine and court costs.
 
 [3]
 
 The trial court denied Johnson’s motion for a new trial or, in the alternative, a judgment notwithstanding the verdict (JNOV). Johnson timely filed a notice of appeal.
 

 ANALYSIS
 

 ¶ 9. Johnson argues that the evidence fails to show that he “willfully” shot into the dwelling since he was actually aiming at Aldridge, who was near the front of the trailer. He claims this case presents an issue of first impression regarding the meaning of the element “willfully” for the crime of shooting into a dwelling
 
 *404
 
 house. Specifically, he argues that all of the testimony only establishes that he intended to shoot Aldridge, not the dwelling. The State argues that because Johnson did not raise this specific argument before the trial court, it cannot be raised for the first time on appeal.
 
 [4]
 

 ¶ 10. It is well established that this Court is “not obligated to review appellate arguments which were not presented in the trial court because ‘[a] trial judge cannot be put in error on a matter which was not presented to him for decision.’ ”
 
 Foster v. State,
 
 928 So.2d 873, 880-81 (¶ 17) (Miss.Ct.App.2005) (quoting
 
 Davis v. State,
 
 866 So.2d 1107, 1113 (¶24) (Miss.Ct. App.2003)). In
 
 Foster,
 
 the defendant’s motion for a directed verdict was too general to support appellate review on the specific issue he raised on appeal.
 
 Id.
 
 at 881 (¶ 18). Similarly, in
 
 Beckum v. State,
 
 917 So.2d 808, 813 (¶ 13) (Miss.Ct.App. 2005), Marvin Beckum, Jr., did not raise the specific allegations in his motion for a JNOV or a new trial as he did on appeal. Consequently, this Court held that Bec-kum’s related allegation on appeal was proeedurally barred.
 
 Id.; see also Neese v. State,
 
 993 So.2d 837, 843 (¶ 12) (Miss.Ct.App.2008) (the defendant was proeedurally barred to raise issue on appeal he did not raise before the trial court);
 
 Gilmore v. State,
 
 772 So.2d 1095, 1098 (¶ 8) (Miss.Ct.App.2000) (the defendant was proeedurally barred from raising an argument for first time on appeal when he had filed a generic JNOV motion in the trial court). We find the same situation here.
 

 ¶ 11. At trial, Johnson argued during his motion for a directed verdict that the State failed to establish that the bullet actually hit the trailer; and furthermore, it was necessary to prove that the bullet actually penetrated the interior residence, and here there was no such proof. However, the trial judge rejected Johnson’s argument. We note Johnson did not make his “willfulness” argument in either his motion for a directed verdict at the close of the State’s case-in-chief or in his post-trial motion for a JNOV or, in the alternative, a new trial. Johnson’s post-trial motion was very generic, only specifically raising the issue of Officer Lawless not being allowed to testify about all the versions of events presented from the different witnesses. The rest of the motion merely stated, in general terms, that the trial court erred in not granting Johnson’s motion for a directed verdict or renewed motion during trial. We agree with the State that this issue is proeedurally barred.
 

 ¶ 12. Procedural bar notwithstanding, we find no merit to the contention that evidence of the appropriate willfulness is lacking.
 

 1. Willfulness
 

 ¶ 13. The pertinent statute reads:
 

 If any person shall
 
 willfully
 
 and unlawfully shoot or discharge any pistol, shotgun, rifle or firearm of any nature or description into any dwelling house or any other building usually occupied by persons, whether actually occupied or not, he shall be guilty of a felony wheth
 
 *405
 
 er or not anybody be injured thereby and, on conviction thereof, shall be punished by imprisonment in the state penitentiary for a term not to exceed ten (10) years....
 

 Miss.Code Ann. § 97-37-29 (Rev. 2000) (emphasis added). Johnson maintains that the evidence fails to show that he “willfully” shot into a dwelling, as he was actually aiming at Aldridge, who just happened to be standing in front of the trailer. As his sole authority for interpreting this statute, Johnson argues
 
 Lester v. State,
 
 692 So.2d 755 (Miss.1997) (overruled on other grounds) “conclusively” establishes that “willfully” means the same as “intentionally” in both ordinary and legal use. In
 
 Lester,
 
 the Mississippi Supreme Court reversed a capital-murder conviction and granted a new trial. However, the defendant unsuccessfully argued that the trial judge erred in overruling an objection to a jury instruction which he argued omitted the intent from the elements of the charge of child abuse.
 
 Id.
 
 at 789. The jury instruction at issue only stated “willfully, unlawfully, and feloniously”; and it did not contain the word “intentionally,” so the defendant argued it did not contain the element of intent, allowing the jury to convict him of child abuse for negligently, not criminally, caused injuries.
 
 Id.
 
 at 789-90. The supreme court held the word “willfully,” in that context, meant “intentionally.”
 
 Id.
 
 at 790 (citing Black’s Law Dictionary 1599 (6th ed. 1990)).
 

 ¶ 14.
 
 Lester,
 
 however, is readily distinguishable from the case at bar, as it does not establish the meaning of “willfully” in all contexts, least of all the required intent of the different crime: shooting into a dwelling. In
 
 Lester,
 
 there is no statutory interpretation at issue, but a jury instruction on a different crime — felonious child abuse. The jury instruction did not contain the word “intent,” but “willfully”; however, the court found these two terms synonymous in that context.
 
 Id.
 
 at 790. Accordingly,
 
 Lester
 
 is not dispositive as argued by Johnson.
 

 ¶ 15. Our independent research indicates that ambiguity as to the culpable mental state of a crime is not a novel issue in criminal statutes where the word “willfully” is concerned.
 
 See generally
 
 Misty D. Shannon, Note,
 
 The Willfulness Requirement: A Chameleon in the Legal Arena,
 
 60 La. L. Rev. 563 (2000) (explaining various interpretations by the United States Supreme Court, Fifth Circuit Court of Appeals, and Louisiana state courts of term “willful” found in various criminal statutes). Wayne R. LaFave, in his treatise
 
 Substantive Criminal Law,
 
 discusses the difficulty “in ascertaining what, if any, state of mind is required for a particular crime” because of the ambiguous meanings of particular words used in criminal statutes, especially the words “willfully” and “unlawfully.” Wayne R. LaFave, Substantive Criminal Law § 5.1(b) (2d ed. 2003). LaFave cites to the United States Supreme Court’s statement that because “ ‘[w]illful’ ... is a ‘word of many meanings’ and ‘its construction [is] often ... influenced by its context.’ ”
 
 Ratzlaf v. United States,
 
 510 U.S. 135, 141, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (quoting
 
 Spies v. United States,
 
 317 U.S. 492, 497, 63 S.Ct. 364, 87 L.Ed. 418 (1943)). In sum, courts in the United States have “defied any consistent interpretation” of “willfully,” giving rise to its “peculiar, chameleon-like nature having different meanings in different contexts.” Shannon,
 
 The Willfulness Requirement,
 
 60 La. L. Rev. at 564-65 (citing
 
 United States v. Granda,
 
 565 F.2d 922, 924 (5th Cir.1978)); LaFave, Substantive Criminal Law at § 5.1(b) n. 9.
 

 
 *406
 
 ¶ 16. The Model Penal Code,
 
 [5]
 
 in its attempt to define “willfully,” states that “[a] requirement that an offense be committed wilfully is satisfied if a person acts knowingly with respect to the material elements of the offense, unless a purpose to impose further requirements appears.” Model Penal Code § 2.02(8) (1962). A person acts “knowingly” with respect to a material element of an offense “if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist” and “if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.” Model Penal Code § 2.02(2)(b)(i)-(ii) (1962).
 

 ¶ 17. The State contends that the statute for shooting into an occupied dwelling does not require a showing of specific intent but cites no authority for that assertion. LaFave comments that “the most common usage of ‘specific intent’ is to designate a special mental element which is required above and beyond any mental state required with respect to the
 
 actus reus
 
 of the crime.... [B]y comparison, ‘general intent’ is only the intention to make the bodily movement which constitutes the act which the crime requires.” LaFave, Substantive Criminal Law at § 5.2(e). Moreover:
 

 A general intent statute is one that prohibits either a specific voluntary act
 
 or something that is substantially certain to result from the act;
 
 thus, words such as “willfully” or “intentionally,” without more, indicate only that a person must have intended to do the act and serve to distinguish that conduct from accidental noncriminal behavior or strict liability crimes. “General criminal intent” refers to whether a defendant has intended deliberate or knowing action, as opposed to causing the prohibited result through accident, mistake, carelessness, or absentmindedness. A general criminal intent crime exists when the statutory definition of the crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence.
 

 22 C.J.S.
 
 Criminal Law
 
 § 39 (2006) (emphasis added). Additionally, for this Court to determine whether a crime is general or specific intent, it “must focus on the legislative intent, which is a determination made by reference to statutory language read in the light of its evident purpose and design.” 21 Am.Jur.2d
 
 Criminal Law
 
 § 122(2008).
 

 ¶ 18. These authorities would indicate that section 97-37-29 should be classified as a general intent crime. The term “willfully,” without more, indicates the person intended to do the unlawful bodily movements: that is, to shoot the firearm. There is no further language in the statute for an intent to do a further act or achieve another consequence, as there would be in a specific intent crime. Additionally, we fail to see how the Legislature’s purpose and design could be accomplished by interpreting this statute in such a manner that if a person shot at an individual and missed and hit a dwelling instead, there is no criminal liability under this statute.
 
 [6]
 

 
 *407
 
 ¶ 19. In looking for authority in Mississippi that categorizes this crime as one of specific intent, we find no case exactly on point, nor has Johnson cited us any pertinent authority. However,
 
 Boyd v. State,
 
 977 So.2d 329, 335 (¶ 22) (Miss.2008), handed down by the Mississippi Supreme Court one month after the judgment of the trial court, dealt with the issue of whether there was sufficient proof that the defendant intended to shoot into the victim’s house. In
 
 Boyd,
 
 Everett Boyd was convicted of murder while engaged in the crime of a drive-by shooting and shooting into an occupied dwelling.
 
 Id.
 
 at 332 (¶ 1). On appeal, Boyd argued that the State had failed to prove he willfully shot into the dwelling.
 
 Id.
 
 at 335 (¶ 22). The supreme court stated that “[a]n act ‘willfully’ done is an act ‘knowingly and ‘intentionally done. Thus, the question is whether the State offered sufficient proof that Boyd had an
 
 intent to shoot into
 
 [the victim’s] house on the night of May 1, 2004.”
 
 Id.
 
 (internal citations omitted) (emphasis added.)
 

 ¶ 20. As neither party cited
 
 Boyd
 
 in its brief, we ordered supplemental briefing on the impact of
 
 Boyd
 
 on the issue of willfulness, how the timing of Boyd’s hand-down one month after the trial court’s judgment affects the State’s argument as to the procedural bar, and if
 
 Boyd
 
 applies, whether the doctrine of transferred intent has any application.
 

 ¶ 21. Not surprisingly, Johnson claimed that
 
 Boyd
 
 supported his position that the crime of shooting into a dwelling is a specific intent crime, and Johnson had no such intent. Regarding the procedural bar, Johnson cited
 
 Ross v. State,
 
 16 So.3d 47, 59 (¶ 32) (Miss.Ct.App.2009) for the proposition that on issues of first impression, a party cannot be required to assert a legal principal prior to its existence as a decided principle of law. Thus, he states that he should not be barred from raising an issue on appeal that was not decided until after trial. Regarding transferred intent, Johnson cites to Mississippi cases where intent was transferred only from one person to another person, not to an inanimate object. However, he acknowledges that the State of Kansas has transferred intent from a person to an inanimate object.
 

 ¶22. The State, not surprisingly, argues that
 
 Boyd
 
 does not change the law regarding the element of willfulness and shooting into a dwelling. Even though in
 
 Boyd,
 
 the State had direct evidence of the defendant’s specific intent to shoot into the dwelling, that is not required by the statute. In the alternative, if
 
 Boyd
 
 were read to require proof of specific intent, the State argues that the doctrine of transferred intent would apply.
 

 ¶ 23. We agree with the State in that
 
 Boyd
 
 does not stand for the proposition that shooting into a dwelling is a specific intent crime.
 
 Boyd
 
 only addresses the act of shooting itself, and it does not address whether the accused must have the intent to achieve the ultimate result of the act. As such, we cannot consider this case as authority holding that shooting into a dwelling is a specific intent crime.
 
 See Craig v. Brown & Williamson Tobacco Corp.,
 
 190 Miss. 360, 360, 200 So. 446, 447
 
 *408
 
 (1941) (if a point is not considered by a reviewing court in a previous decision, it is not regarded as precedent).
 

 ¶ 24.
 
 Boyd
 
 does not specifically address the possibility of transferred intent, but it does state that unless intent is expressed, “the only method by which intent may be proven is by showing the acts of the person involved at the time, and by showing the circumstances surrounding the incident.”
 
 Id.
 
 (quoting
 
 Thompson v. State,
 
 258 So.2d 448, 448 (Miss.1972)). Further, intent to do an act is considered: “a question of fact to be gleaned by the jury from the facts shown in the case. The intent to commit a crime or to do an act by a free agent can be determined only by the act itself, surrounding circumstances, and expressions made by the actor with reference to his intent.”
 
 Id.
 
 at 335-36 (¶ 23) (quoting
 
 Wheat v. State,
 
 420 So.2d 229, 238 (Miss.1982)). Accordingly,
 
 Boyd
 
 appears to suggest that if shooting into an occupied dwelling is a specific intent crime, intent may be found from the surrounding circumstances.
 

 ¶ 25. However, other authority, such as
 
 Johnson v. State,
 
 744 So.2d 833 (Miss.Ct. App.1999), suggests the term “willfully” in other Mississippi criminal statutes does not indicate specific intent. In
 
 Johnson,
 
 the defendant’s conviction for armed robbery was reversed and remanded for a new trial.
 
 Id.
 
 at 836, 837-38 (¶¶ 10, 17). A jury instruction on the intentional element in robbery was at issue.
 
 Id.
 
 at 836 (¶ 10). Alfred T. Johnson argued that the instruction failed to properly inform the jury, because it merely stated the jury could convict if it found Johnson “willfully” took the property of the business, without mentioning that the taking must have been with the specific intent to deprive the owner of the property.
 
 Id.
 
 at (¶ 11). This Court agreed with Johnson’s argument, and we found an essential element of the crime of robbery unexplained in the jury instruction.
 
 Id.
 
 at 837 (¶ 15). Therefore, from this holding, we cannot say that the term “willfully” always equates with a specific intent crime in Mississippi.
 

 ¶ 26. An examination of statutes and case authority throughout the United States on this crime shows a variety of language is used, usually interpreted by courts to create a general intent crime; the shooter need not have the specific intent to hit the building. The State of California has recently construed its statute for this crime to be one of general intent in a case factually on all fours to this one:
 
 Fratus v. Adams,
 
 2009 WL 1649730 (C.D.Cal.2009). California’s statute states: “Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house ... is guilty of a felony.” Cal.Penal Code § 246. The
 
 Fratus
 
 court determined this statute requires only general intent, and “the prosecution was not required to prove that the defendant had an intent to fire into the dwelling.”
 
 Fratus,
 
 2009 WL 1649730 at *44. The California court went on to state that the statute “is not limited to the act of shooting directly ‘at’ an inhabited or occupied target. Rather, the act of shooting ‘at’ a proscribed target is also committed when the defendant shoots in such close proximity to the target that he shows a conscious indifference to the probable consequence that one or more bullets will strike the target or persons in or around it.”
 
 Id.
 
 (citing
 
 People v. Overman,
 
 126 Cal.App.4th 1344, 24 Cal.Rptr.3d 798, 805 (2005)).
 

 ¶ 27. Other jurisdictions with similar state statutes have held similarly, finding that the shooter needs to intend to hit the occupied dwelling, or have applied the doctrine of transferred intent.
 
 See Harrison v. Culliver,
 
 2008 WL 2326321, *6-8 (S.D.Ala.2008) (statute which does not include specific culpable mental state for
 
 *409
 
 shooting into a dwelling and was not deemed to be strict liability offense had culpable mental state deemed as either intentionally, knowingly, recklessly, or with criminal negligence);
 
 State v. Walker,
 
 28 Kan.App.2d 700, 20 P.3d 1269, 1276 (2001) (applying the doctrine of transferred intent to transfer the defendant’s criminal intent to shoot individual to the criminal intent required for discharge of firearm in occupied dwelling);
 
 Fleming v. Commonwealth,
 
 13 Va.App. 349, 412 S.E.2d 180, 183 (1991) (discharging firearm at occupied dwelling deemed to be general intent offense, not specific intent crime; state statutory violation established by proof that the person discharged firearm in direction of dwelling, even if person did not specifically intend to shoot in this direction); Car
 
 ter v. State,
 
 469 So.2d 775, 778 (Fla.Dist.Ct.App.1984) (holding the statute for throwing deadly missile was violated, even though evidence showed defendant aimed missile at and intended to hit the guard rather than the building).
 

 ¶ 28. However, we acknowledge that state courts have held the opposite and maintained specific intent is necessary. In
 
 State v. Ruel,
 
 141 Idaho 600, 114 P.3d 158, 160-61 (2005), where the language of a state statute used “intentionally and unlawfully,” the Idaho Court of Appeals found that a jury instruction was troublesome since it created the risk that the intent element would apply only to discharging the firearm and would not require intent that the discharge be directed at a dwelling. This Court maintains, in this issue of first impression, that the more logical interpretation of willfulness is to hold that sufficient intent is established even if the shooter does not have the intent to hit the building, but he knows the probable consequences of missing the target will be to strike the building.
 

 ¶ 29. While there are no cases exactly on point in Mississippi for this situation, there is one case that is somewhat analogous where the conviction was upheld.
 
 [7]
 
 In
 
 Bryant v. State,
 
 850 So.2d 1130, 1135 (¶ 18) (Miss.Ct.App.2002), this Court upheld the defendant’s conviction for shooting into a dwelling, aggravated assault, and murder. Eddie Bryant and Gregory Brown had an altercation with Brown’s shooting at Bryant as Bryant walked down the street, missing him.
 
 Id.
 
 at 1132 (¶2). Shortly thereafter, as Brown was nearing his house to retrieve more ammunition, he heard Bryant say: “I am going to kill you!” and fired shots in Brown’s direction, missing him.
 
 Id.
 
 at 1132 (¶ 4). When Brown went into his home to retrieve more ammunition, he found his niece had been hit in the head by a bullet and subsequently died.
 
 Id.
 
 Evidence showed the bullet had traveled through another object, like a wall, before impacting the child’s head.
 
 Id.
 
 at 1133 (¶ 8). While there was no specific issue on appeal regarding lack of intent by Bryant to shoot Brown’s niece, this Court found the weight and sufficiency of the evidence ample to support Bryant’s conviction on all charges, including shooting into a dwelling.
 
 Id.
 
 at 1135 (¶ 18).
 

 ¶ 30. Another factually similar case is
 
 Louisiana v. Dowdell,
 
 106 La. 645, 31 So. 151 (1901). There, the indictment charged the defendant with “wilfully, wantonly, fe-loniously and of his malice aforethought” shooting into a dwelling house.
 
 Id.
 
 at 151. The defendant in
 
 Dowdell
 
 made the same argument as Johnson — that he did not deliberately shoot into the house, but shot at the intended victim, who was standing upon the gallery of the house. Therefore,
 
 *410
 
 he did not fall under the terms of the statute and could not be found guilty. The Louisiana statute at issue contained no element of intent.
 
 Id.
 
 at 152. The Louisiana Supreme Court, in affirming the conviction, found that the act of shooting into a dwelling house where individuals reside “was deemed so perilous or injurious as to justify it in making ... that act,
 
 per se,
 
 a crime, without reference to intent.” The
 
 Dowdell
 
 court went on to state that parties may be criminally responsible for unforeseen consequences of an illegal act; “[particular consequences of an illegal act whose natural probable results the law seeks to prevent ... do not stand excused because they may in fact have been unintended.” The court concluded that the shooting at the dwelling, where the family resided, and the shooting of the intended victim “were concurrent, simultaneous, illegal acts.... It cannot be claimed that legal responsibility for shooting at the house was lost because in so shooting the intent was to shoot at a person in the house.”
 
 Id.
 
 at 153.
 

 ¶ 31. We find
 
 Dowdell
 
 ’s reasoning instructive. Johnson must be presumed to have known that when he attempted to shoot Aldridge while the fight ensued in front of the trailer, a “natural probable result” of this illegal act was the possibility of shooting into the trailer. Johnson risked the legal consequences once he shot the firearm, as the defendant did in
 
 Dow-dell.
 
 Furthermore, to borrow LaFave’s terms, Johnson intended “to make the bodily movement,” that is, to shoot the firearm, which caused the crime, whether it resulted in the death or injury to Aldridge, or shooting into a dwelling. Just because Johnson missed Aldridge and shot the trailer where several adults and children were present, Johnson’s criminal culpability should not be lost.
 

 ¶ 32. Based on the foregoing, we reject Johnson’s contention that “willfully” in section 97-37-29 must be interpreted to mean Johnson had to have the specific intent to shoot into the trailer. We now turn to the sufficiency and weight of the evidence regarding this charge.
 

 2. Sufficiency and Weight of the Evidence
 

 ¶ 33. Johnson maintains that evidence indicating the element of “willfulness” under section 97-37-29 was insufficient. Further, he argues that the verdict is contrary to the weight of the evidence for the same reason. Thus, Johnson concludes his motion for a new trial or, in the alternative, JNOV should have been granted.
 

 ¶34. A motion for a directed verdict and JNOV both challenge the sufficiency of the evidence.
 
 McClain v. State,
 
 625 So.2d 774, 778 (Miss.1993). The standard of review is the same for both: we must give the prosecution “the benefit of all favorable inferences that may be reasonably drawn from the evidence.”
 
 Id.
 
 The evidence will be reviewed in the light most favorable to the State.
 
 Id.
 
 (citing
 
 Esparaza v. State,
 
 595 So.2d 418, 426 (Miss.1992)). All credible evidence consistent with the defendant’s guilt will be accepted as true.
 
 Id.
 
 (citing
 
 Spikes v. State,
 
 302 So.2d 250, 251 (Miss.1974)). “[R]ever-sal can only occur when evidence of one or more of the elements of the charged offense is such that ‘reasonable and fair minded jurors could only find the accused not guilty.’ ”
 
 Stewart v. State,
 
 909 So.2d 52, 56 (¶ 16) (Miss.2005).
 

 ¶ 35. On the other hand, a motion for a new trial challenges the weight of the evidence.
 
 Sheffield v. State,
 
 749 So.2d 123, 127 (¶ 16) (Miss.1999). Matters regarding the weight of the evidence are to be settled by the jury.
 
 Stegall v. State,
 
 
 *411
 
 765 So.2d 606, 610 (¶ 10) (Miss.Ct.App. 2000) (citing
 
 Neal v. State,
 
 451 So.2d 748, 758 (Miss.1984)). Therefore, this Court’s scope of review is limited. This Court must accept as true the evidence presented which supports the verdict.
 
 Id.
 
 (citing
 
 Eakes v. State,
 
 665 So.2d 852, 872 (Miss. 1995)). “[W]e will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Bush v. State,
 
 895 So.2d 836, 844 (¶ 18) (Miss.2005) (citing
 
 Herring v. State,
 
 691 So.2d 948, 957 (Miss.1997)).
 

 ¶ 36. In reviewing the record, we find the State presented sufficient proof that Johnson shot a firearm into a dwelling house within the meaning of section 97-37-29. As discussed above, we do not interpret the statute as requiring the State to show Johnson specifically intended to shoot into the dwelling. Taken in the light most favorable to the State, the testimonies of two eyewitnesses, Aldridge and Stokes, show Johnson willfully and unlawfully fired the weapon in the direction of the trailer and struck it. The proof also shows Johnson was aiming at Aldridge, who was standing in fi-ont of the trailer. Furthermore, Deputy Lawless personally observed a hole in the front of the trailer’s siding. Even though the bullet was never retrieved from inside the wall, Deputy Lawless stated the hole was the correct size for a .22-caliber bullet. Witnesses stated the hole, which was in the front of the trailer where the altercation had been, was not there before the incident. Also, Aldridge’s and Stokes’s testimonies about the incident were the same, and other evidence corroborated their version of events. On the other hand, Johnson merely testified that the eyewitnesses were lying, and his version of the events — that the victim Aldridge actually had the gun and Johnson was attempting to rid him of it when it accidentally fired — was what happened. On the stand, Johnson also denied telling Deputy Lawless, in two unrecorded statements, that the three co-defendants intended to rob Aldridge and that Divine was the shooter.
 

 ¶ 37. Furthermore, regarding the weight of the evidence, we do not find the guilty verdict is so contrary to the weight of the evidence that allowing it to stand would sanction an unconscionable injustice. We find the jury was presented with substantial evidence to support the conviction of Johnson for the crime of shooting into a dwelling house. Johnson’s issues are, therefore, without merit.
 

 ¶ 38. THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY OF CONVICTION OF COUNT III, SHOOTING INTO A DWELLING HOUSE, AND SENTENCE OF TEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND TO PAY A $10,000 FINE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO RANKIN COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, ISHEE, ROBERTS AND MAXWELL, JJ„ CONCUR.
 

 [1]
 

 . It is noted Watson also has a child by Taylor.
 

 [2]
 

 . Neither Johnson nor the other co-defendants were indicted for aggravated assault with a firearm, just a bat.
 

 [3]
 

 . At his sentencing hearing, it was noted Johnson, while out on bond in this case, was arrested on a subsequent charge in February 2006 for possession of a stolen firearm. Law enforcement responded to a disturbance in which Johnson, while involved in an altercation with his brother, Watson, pulled a weapon on Watson.
 

 [4]
 

 . The only basis for the defense's motion for a directed verdict at trial was whether it is necessary under Mississippi Code Annotated section 97-37-29 (Rev.2000) for the State to prove that the shot penetrated to the interior of the building. The State countered, citing
 
 May v. State,
 
 569 So.2d 1188, 1189-90 (Miss. 1990), which held that it is not necessary for the State to prove that the shot penetrates the building, but it merely struck the structure. The bullet in this case did not enter into the interior of the dwelling, but apparently, it just penetrated the exterior wall (the bullet was never recovered). The trial judge found Johnson's argument a "strained interpretation of the statute. The point is to punish people for shooting at occupied dwellings." Johnson does not challenge this ruling on appeal.
 

 [5]
 

 . The Model Penal Code divides culpability into four types: purposely, knowingly, recklessly, and negligently. Model Penal Code § 2.02 (1962). The drafters deliberately excluded the term "willfully” as a type of criminal mental state because of its "unusually ambiguous” nature. Model Penal Code § 2.02(8) cmt. (1962). In discussing the general requirements of culpability, the Model Penal Code found it necessary to attempt to define "willfully” because of the word's existence outside of the Model Penal Code and its need for clarification.
 
 Id.
 

 [6]
 

 . In Mississippi, the Legislature has used the terms "willfully” and "unlawfully," but it further added an element of intent to create a
 
 *407
 
 specific intent crime, such as the statute for shoplifting. The statute states in pertinent part: "Any person who shall
 
 willfully and unlawfully
 
 take possession of any merchandise owned or held by and offered or displayed for sale ...
 
 with the intention and purpose of
 
 converting such merchandise to his own use without paying the merchant's stated price ... shall be guilty of the crime of shop-lifting_” Miss.Code Ann. § 97-23-93(1) (Rev.2006) (emphasis added). The statute for shooting into a dwelling has no such additional intent element beyond the words "willfully and unlawfully,” indicating a general intent crime.
 

 [7]
 

 . In most of the reported cases in Mississippi, the defendant, charged with this crime, usually had the intent to shoot into the dwelling.