# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00358-COA

**JAMES STANLEY ROBERTS A/K/A JAMES S. ROBERTS**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                **APPELLEE**

DATE OF JUDGMENT:             02/16/2024
TRIAL JUDGE:                  HON. PRENTISS GREENE HARRELL
COURT FROM WHICH APPEALED:    LAWRENCE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:       AUTUMN BREEDEN SMITH
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                              BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:            HALDON J. KITTRELL
NATURE OF THE CASE:           CRIMINAL - FELONY
DISPOSITION:                  AFFIRMED - 09/02/2025
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., WESTBROOKS AND McDONALD, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1. A Lawrence County jury convicted James Roberts of aggravated domestic violence with a firearm after he shot his girlfriend, Erica Reeves, in the back. The trial court sentenced Roberts to serve twenty years for that conviction and an additional five years for a firearm enhancement to be served consecutively in the custody of the Mississippi Department of Corrections. On appeal, Roberts argues that the trial court misstated the law by instructing the jury on general intent as it relates to aggravated domestic violence, thereby rendering Roberts's trial fundamentally unfair. Roberts also argues the trial court erred by constructively amending his indictment. Finding no merit to these arguments, we affirm.

## STATEMENT OF FACTS

¶2.     On March 16, 2022, the Lawrence County Sheriff's Department responded to a 911 call reporting that a female had been shot by Roberts at his residence in Silver Creek, Mississippi.  Upon arrival, law enforcement found Erica on the ground with Roberts and Andrew Peavy rendering her aid.  Erica had been shot in the back while trying to leave Roberts's house with Peavy and his friend, Chris Bass.  At the time of the shooting, Erica was in a relationship with Roberts, but Peavy testified that he also was Erica's boyfriend at the time.

¶3.     Erica was a twenty-eight-year-old mother of five children at the time of the shooting, while Roberts was a fifty-three-year-old married man who was estranged from his current wife.  Erica and Roberts were lifelong family friends, but in 2019, their relationship became sexual.  Additionally, the couple frequently used methamphetamine and Xanax together.[1]

¶4.     Testimony at trial conflicted about Peavy's relationship with Erica, and whether Roberts intended to shoot Erica.  Several facts, however, were undisputed, such as Erica and Roberts's sexual relationship and use of drugs together.  No one disputed that Roberts fired three shots from his .30-.30 lever-action rifle, either.  The three eyewitnesses, Bass, Peavy, and Erica, all agreed that Roberts's first shot was fired into the air, the second shot was fired at the ground, and the bullet from the third shot struck Erica in the back.  Erica's injuries resulted in a lengthy hospital stay and paralysis, leaving Erica wheelchair-bound.

---

[1]  Erica did not testify whether she and Roberts had used drugs on the day of the shooting, but both individuals tested positive for methamphetamine, Xanax, and a marijuana metabolite.

*Chris Bass's Testimony*

¶5.     Bass testified he knew Erica through his friend Peavy, whom Erica was dating.  On the day of the shooting, Bass was at Peavy's house when Peavy received a text message from Erica saying "come get me" when she was at Roberts's house.  When Bass and Peavy arrived, they found Roberts and Erica outside arguing.  Roberts was on the porch, and Erica was off the porch in the yard.  Bass testified that he saw Roberts shoot once in the air and once at the ground.  In response, Erica threw a canned drink at Roberts.  Then, Bass saw Roberts "shoulder the rifle" and pull the trigger, firing a third shot into Erica's back.  Erica, who was facing Bass and Peavy, rotated and fell backwards.  Bass and Peavy got out of their vehicle and ran to Erica.  Bass called 911 to report the shooting and obtain an ambulance while Peavy rendered aid to Erica.

¶6.     During the 911 call, which was played for the jury, Bass told the dispatcher that he did not know who shot Erica because he did not witness the shooting.  Later in the call, Bass admitted that he saw the shooting, but he claimed it was an accident.  During cross-examination, Bass blamed these factual inconsistencies on his being in a state of shock.  Also, during cross-examination, Bass's statement given to law enforcement at the scene was read to the jury:

> I, Chris Bass, rode with my friend to pick up his girlfriend.  We pull up, and Stan was at his car and got mad and went inside and grabbed his gun and threatened to shoot us.  We went to leave.  She said, "No, stay."  He pulled his gun on her and shot her - - and shot at her then he shot her in the back.

However, Bass testified that Roberts never threatened him—only Erica.

*Andrew Peavy's Testimony*

3

¶7.     Peavy testified that Erica was his live-in girlfriend in March 2022, and he knew Roberts through Erica.  Peavy thought Erica and Roberts were only friends until the shooting.  Earlier that day, Roberts had agreed to take Erica to a court proceeding because Peavy could not take her.  Later that day, Peavy received a text from Erica, stating, "[W]here you at and how fast can you get here?"  Peavy knew Erica was at Roberts's house and responded, "I can be there in two or three minutes, why?"  Erica replied, "Just get here."

¶8.     Peavy and Bass drove to Roberts's house, where Peavy had previously been.  Contrary to Erica's later testimony, Peavy testified that he and Roberts had never had any issues with one another, and Roberts had never told Peavy he was unwelcome at Roberts's house.

¶9.     Peavy and Bass drove up and waited for Erica.  Roberts, who was outside rummaging in his vehicle, glared at Peavy and called him a "f***ing cock block."  Roberts then went inside and began arguing with Erica.  The argument escalated and moved to the porch, as Peavy and Bass sat in their vehicle and watched.  Peavy testified that at one point, Roberts slapped Erica, but she "didn't back down," so Roberts stated, "I got a way to handle this. I'm going to get my gun."  Erica told Roberts, "Go get your F-ing gun.  Ain't nobody scared." Peavy, after hearing Roberts's threat, told Erica he was going to leave and go down the road in an attempt to de-escalate the situation.  Erica, however, told Peavy that if he left, they were "done"; so Peavy stayed.

¶10.    Roberts returned to the porch with his .30-.30 rifle.  Peavy testified that Roberts shot once in the air to Roberts's right.  Roberts and Erica continued to argue.  Roberts then fired

4

another shot at Erica's feet. Erica turned around and started cursing at Roberts, who then told her to "get off my property." As Erica turned around to leave, Roberts "shouldered his gun" and shot Erica in the back. Peavy ran to Erica, who was lying on the ground, and tried to stop her bleeding while Roberts ran around "freaking out." Peavy told Bass to call 911, but Roberts said, "[N]o, don't do that, it's just a flesh wound." Bass ignored Roberts and called 911 while Roberts took his gun inside the house. Peavy testified that Roberts came back outside and began collecting shell casings. Eventually, Roberts came over to Peavy and Erica, asking if she was alright. Peavy told Roberts to go get something to help control the bleeding. Peavy testified that he never thought Roberts was shooting at him, only Erica.

*Erica Reeves's Testimony*

¶11. During the State's case-in-chief, Erica testified that Roberts shot her, but not intentionally. This testimony came as a surprise to the prosecution, as will be discussed below. Erica admitted to having a sexual relationship with Roberts since 2019 and said that they used methamphetamine and Xanax together. She testified that they both cared for one another. Moreover, Erica denied ever having a dating relationship with Peavy, maintaining that they were "just friends."

¶12. Erica testified that on the day of the shooting, she was "hanging out" at Roberts's house. Erica claimed that she and Roberts never argued, and they were not fighting that day. Peavy and Bass went to Roberts's house because Erica had asked Peavy to come get her. Erica and Roberts were inside, but when Peavy and Bass pulled up, Roberts went outside and became aggravated when he saw Peavy. Erica testified that Roberts disliked Peavy

5

because Peavy had talked about robbing Roberts—a claim Peavy denied.

¶13. Roberts went inside his house and came back out with a gun. By this time, Erica was outside by the door. Erica testified that Roberts walked past her to the edge of the porch and fired the gun to the right of the porch. She started to walk off the porch to get into Peavy's vehicle, but Peavy was pulling away toward the road in response to the gunshot. As Erica walked past Roberts, he fired a second shot at the ground, hitting some rocks to the right of Erica; however, she "kept going." Because Peavy had pulled to the road, Erica stood at the back of a truck in Roberts's driveway, waiting for Peavy to return. Then, she got shot, and it felt like "fireworks" inside of her body. The last thing Erica remembered was Peavy's running towards her as she fell to the ground, and then someone pushing hard, holding pressure on her back. Erica woke up in the hospital, where she stayed for about a month, undergoing extensive medical treatments for her injuries. Erica testified that due to the gunshot, she is paralyzed and confined to a wheelchair, probably for life.

¶14. On cross-examination, Erica insisted that Roberts was not mad at her but at Peavy. She maintained that Roberts did not intend to shoot her but instead was shooting to scare Peavy, who had previously talked about robbing Roberts. Erica testified that she had forgiven Roberts for shooting her and still loved him.

¶15. Erica also explained during cross-examination why her statement to law enforcement differed vastly from her direct-examination testimony. In May 2022, Erica gave a statement to the sheriff once she was released from the hospital, saying Roberts intentionally shot her, and it was not an accident, in contrast to her trial testimony. However, Erica testified that

6

this statement was based on what she was told happened to her by other individuals, not based on what actually happened. Erica testified that she tried to tell the prosecutors that her statement was incorrect a few days before trial.[2]

*Testimony about the Investigation*

¶16.    Three law enforcement officers involved at the scene and in the investigation testified for the State. Captain Garrett Bradford arrived at the scene first, followed by Sheriff Ryan Everett and Deputy Sheriff Ryan McCall. Captain Bradford testified that he secured the scene once he arrived. Roberts told him the .30-.30 rifle was inside. Captain Bradford found it lying inside a bathtub.

¶17.    Sheriff Everett testified that when he arrived at the scene, he saw Erica on the ground with two men, one on either side of her. One individual, later identified as Roberts, was applying pressure to a wound on Erica's back; the other person, later identified as Peavy, was holding Erica up. Sheriff Everett located two spent shell casings outside—one on the ground and one on the porch, as well as one inside in the kitchen—all were .30-.30 shell casings. Sheriff Everett testified that the gun Roberts used was unique because it was not self-loading—it had to be manually loaded by pulling a lever.

¶18.    Captain Bradford took photographs of the scene, including a vehicle specked with

---

[2] At the hearing on Roberts's post-trial motion, the prosecutor told the trial court that Erica never told the State that her statement was incorrect or that its content was coerced. The prosecutor stated that in the days before trial, Erica gave no indication to the State that her testimony would differ from her statement. However, in the weeks before trial, defense counsel contacted another prosecutor and mentioned that Erica's testimony might differ. The prosecutor confronted Erica about this revelation, but Erica denied she would change her testimony. Erica also denied telling anyone she thought the shooting was an accident.

dirt and an area on the ground where it looked like a bullet had struck the dirt and ricocheted onto the hood of the vehicle. Sheriff Everett agreed that the vehicle's dirt flecks looked consistent with being caused by a bullet striking the ground nearby. At the scene, Captain Bradford heard Peavy's yelling at Roberts, to the effect of, "You didn't have to shoot her. You shot her," to which Roberts responded, "I didn't mean to." Sheriff Everett and Deputy McCall heard Roberts's statements as well.

¶19. Deputy McCall testified that he helped secure the scene. He learned that Peavy had received a text message from Roberts's phone by Erica stating Roberts had taken some type of narcotic, and she "wanted to get out of [t]here." Deputy McCall testified that Roberts claimed he only shot into the air.

¶20. Officers arrested Roberts at the scene, while Peavy and Bass separately gave statements at the scene. Both men told officers that Roberts fired the rifle three times, which was consistent with their trial testimony. The officers testified that either Peavy or Bass told them that Erica threw a tall energy-drink can at Roberts's face after the second shot. Peavy and Bass did not describe the shooting as an accident to the officers.

¶21. An expert in forensic toxicology, John Stevenson, testified that due to the drugs found in Roberts's blood (methamphetamine, amphetamine, Xanax, and a metabolite of marijuana), Roberts would have felt their effects at the time of the shooting. Analysis of Roberts's urine matched the drugs detected in his blood. Stevenson testified that methamphetamine, in particular, would have caused aggression, paranoia, and hallucinations.

# ANALYSIS

## I.    Jury Instruction Number 7 on General Intent

¶22.    Roberts argues that the trial court erred in giving the State's jury instruction S-12, which became Instruction Number 7 for the jury, stating that aggravated domestic violence is a crime of general intent. Roberts contends that the jury instruction "misstated the law" because "aggravated assault domestic violence" is a crime of specific intent, and the grant of this instruction rendered his trial fundamentally unfair.

¶23.    The decision to give or refuse jury instructions is within the discretion of the trial court; thus, the standard of review is abuse of discretion. *Horn v. State*, 273 So. 3d 759, 766 (¶24) (Miss. Ct. App. 2018) (citing *Moody v. State*, 202 So. 3d 1235, 1236-37 (¶7) (Miss. 2016)). Jury instructions should be read together as a whole, "with no one instruction . . . read alone or taken out of context." *Bailey v. State*, 78 So. 3d 308, 315 (¶20) (Miss. 2012). "When read together, if the jury instructions fairly state the law of the case and create no injustice, then no reversible error will be found." *Id.*

¶24.    Jury Instruction Number 7 read:

> The crime of aggravated assault domestic violence with a firearm is a general intent crime under the laws of Mississippi. General intent is only the intention to make the bodily movement which constitutes the act which the crime requires. Moreover, a general intent statute is one that prohibits either a specific voluntary act or something that is substantially certain to result from the act; thus, words such as "willfully" or "intentionally," without more, indicate only that a person must have intended to do the act and serve to distinguish that conduct from accidental noncriminal behavior or strict liability crimes. "General criminal intent" refers to whether a defendant has intended deliberate or knowing action, as opposed to causing the prohibited result through accident, mistake, carelessness, or absentmindedness.

After the first day of trial, the State submitted three late-filed[3] proposed jury instructions on transferred intent, self-defense, and general intent (S-10, S-11, and S-12, respectively) in response to the defense's theory of its case and new evidence presented, mainly from Erica, who changed her expected testimony to claim her shooting was an accident. The State argued that aggravated domestic violence is a general intent crime.

¶25.    Defense counsel objected to all three instructions, claiming that the State (whose theory of the case had been that Roberts intentionally shot Erica) had "essentially come up with a new theory" to convict Roberts based on general or transferred intent—that Roberts was trying to shoot at Peavy and Bass but instead shot Erica by accident, thereby allowing the jury the opportunity to convict Roberts of aggravated domestic violence even if he did not intend to shoot Erica. Roberts maintained his defense that he did not intend to shoot anyone—he "accidentally misfired" and shot Erica. However, defense counsel never argued before the trial court that instruction S-12 was an incorrect statement of law, just that it would be "confusing" to the jury. The trial court refused the instructions on self-defense and transferred intent without elaboration but gave the instruction on general intent, stating it was proper because aggravated domestic violence is a "general-intent crime."

¶26.    Roberts was indicted for aggravated domestic violence under Mississippi Code

---

[3] Defense counsel objected to the trial court, arguing the State should have filed these three instructions at least twenty-four hours before trial under Rule 22 of the Mississippi Rules of Criminal Procedure and Rule 3.07 of the former Uniform Rules of Circuit and County Court Practice. The State countered that it submitted supplemental instructions based upon the arguments that were produced by the defense the day before at trial, and Erica's new testimony that the shooting was accidental. The trial court overruled the objection and considered the three proposed instructions.

Annotated section 97-3-7(4)(a)(ii) (Rev. 2020), which states in pertinent part:

> When the offense is committed against . . . [a] person who has a current or former dating relationship with the defendant, . . . a person is guilty of aggravated domestic violence who . . . [a]ttempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm.

On appeal, Roberts acknowledges that aggravated assault alone, under section 97-3-7(2), is a crime of general intent, not requiring a specific victim or result. *See McGowan v. State*, 541 So. 2d 1027, 1029 (Miss. 1989) (finding there is no specific intent requirement for aggravated assault). However, he claims that whether aggravated domestic violence under section 97-3-7(4)(a)(ii) is a crime of general or specific intent is an issue of first impression. He notes that there have been no Mississippi cases that specify the intent element of aggravated domestic violence since the statute's amendment in 2013.[4] The crux of Roberts's argument is that aggravated domestic violence cannot be a crime of general intent, only specific intent, because it requires the victim to fall within a group of narrowly defined individuals. Thus, he concludes that Jury Instruction 7 is a misstatement of law. We disagree.

¶27.  *Johnson v. State*, 44 So. 3d 400 (Miss. Ct. App. 2010), is instructive on specific and general intent. There, this Court discussed whether the crime of shooting into an occupied

---

[4]  Before the 2013 amendment to the statute, section 97-3-7(4) defined aggravated domestic violence merely by referencing aggravated assault and adding the domestic relationships: "(4) A person is guilty of aggravated domestic violence who commits aggravated assault as described in subsection (2) of this section . . . ." In 2013, the Legislature removed the reference to the aggravated-assault subsection and instead rewrote the crime's elements, using the same aggravated assault language. 2013 Miss. Laws ch. 565, §1 (H.B. 709). We do not find the statute's 2013 amendment changed the intent element of the crime, as Roberts contends; therefore, cases before 2013 are applicable.

dwelling required a showing of specific intent and found it did not. *Id.* at 407-10 (¶¶19-32).

We stated:

> [T]he most common usage of "specific intent" is to designate a special mental element which is required above and beyond any mental state required with respect to the *actus reus* of the crime. . . . By comparison, "general intent" is only the intention to make the bodily movement which constitutes the act which the crime requires.

*Id.* at 406 (¶17) (citing Wayne R. LaFave, Substantive Criminal Law § 5.2(e) (2d ed. 2003)).

Additionally,

> A general intent statute is one that prohibits either a specific voluntary act or something that is substantially certain to result from the act. . . . "General criminal intent" refers to whether a defendant has intended deliberate or knowing action, as opposed to causing the prohibited result through accident, mistake, carelessness, or absentmindedness. A general criminal intent crime exists when the statutory definition of the crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence.

*Id.* (quoting 22 C.J.S. *Criminal Law* § 39 (2006)). Additionally, to determine whether a crime is general or specific intent, a reviewing court "must focus on the legislative intent, which is a determination made by reference to statutory language read in the light of its evident purpose and design." *Id.* (quoting 21 Am. Jur. 2d *Criminal Law* § 122 (2008)).

¶28. We are not convinced by Roberts's argument that the aggravated domestic violence statute's requiring the victim to have a specific relationship with the defendant makes it a specific intent crime. The statute does not create a requirement for a specific *result* beyond the act itself, as would a specific intent crime, nor does the statute create "a special mental element which is required above and beyond any mental state required" from the act of aggravated assault. *See Johnson*, 44 So. 3d at 406 (¶17) (citing LaFave, *supra*, § 5.2(e)).

12

Requiring the intent to achieve a specific result for the crime's act does not equate with the victim's having a specific relationship with the defendant.

¶29. Further, the plain language of the aggravated domestic violence statute is not incongruous with general intent, as Roberts claims. The statute only requires that the defendant "make the bodily movement which constitutes the act" of the crime, as Jury Instruction Number 7 explains, meaning the person must intend the act, as opposed to an act's being accidental. Here, the act is to attempt or "purposely or knowingly cause[] bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm"—the same language used to define aggravated assault with a deadly weapon. *Compare* Miss. Code Ann. § 97-3-7(2)(a)(ii) *with* Miss. Code Ann. §97-3-7(4)(a)(ii).

¶30. Indeed, the supreme court has held that "[u]nder th[e] statute[,] aggravated domestic violence is the *same crime* as aggravated assault, except that aggravated domestic violence is committed against a victim within the category of persons specified in the statute" with a certain domestic relationship to the defendant. *Wilson v. State*, 904 So. 2d 987, 993 (¶11) (Miss. 2004) (emphasis added). Further, these two crimes, although located under separate subsections, are under the same Code section and contain identical language describing the act of the crime. The legislative purpose and design of aggravated domestic violence is the same as aggravated assault, only specified to protect those with a domestic relationship to the defendant. Therefore, we are not persuaded by Roberts's contention that the existence of a domestic relationship results in this crime's becoming one of specific intent.

¶31. In conclusion, the instructions were not confusing when read as a whole; they fairly

13

stated the law of the case and created no injustice. Under both statutory law and judicial caselaw, Jury Instruction Number 7 was not a misstatement of law, and Roberts's numerous reasons why his trial was fundamentally unfair due to the instruction are without merit.

## II. Constructive Amendment of the Indictment

¶32. Roberts argues that the trial court constructively amended his indictment from aggravated domestic violence to aggravated assault through Jury Instruction Number 7 and the State's closing argument, which improperly allowed the State to introduce concepts of transferred and general intent. Further, Roberts claims his indictment was defective because it "did not provide any language or notice that Roberts was being tried for aggravated assault." Roberts contends these alleged errors require reversal of his conviction.

¶33. Roberts presents these arguments about his indictment for the first time on appeal. The Mississippi Supreme Court has "held that a defendant's 'failure to object to the jury instruction as constructively amending the indictment waives this issue on appeal.'" *Brent v. State*, 296 So. 3d 42, 50 (¶30) (Miss. 2020) (quoting *Neal v. State*, 15 So. 3d 388, 397 (¶13) (Miss. 2009)). "If no contemporaneous objection is made, the error, if any, is waived and [our] review is limited to plain error." *Id.* (internal quotation marks omitted). However, because the State filed its jury instruction on general intent late, and Roberts may not have had time to research its impact on the indictment, we will address the issue on the merits. "Whether an indictment was improperly amended is a question of law, which we review de novo." *Roberson v. State*, 287 So. 3d 219, 230 (¶25) (Miss. Ct. App. 2017).

¶34. The purpose of an indictment is "to furnish the accused such a description of the

charges against him as will enable him to adequately prepare his defense." *Fulton v. State*, 146 So. 3d 975, 977 (¶6) (Miss. 2014) (quoting *Williams v. State*, 445 So. 2d 798, 804 (Miss. 1984)). "[T]he State can prosecute only on the indictment returned by the grand jury[,] and . . . the court has no authority to modify or amend the indictment in any material respect." *Quick v. State*, 569 So. 2d 1197, 1199 (Miss. 1990). "A constructive amendment of the indictment occurs when the proof and instructions broaden the grounds upon which the defendant may be found guilty of the offense charged so that the defendant may be convicted without proof of the elements alleged by the grand jury in its indictment." *Bell v. State*, 725 So. 2d 836, 855 (¶58) (Miss. 1998).

¶35. The indictment does not track the language of the statute exactly. Roberts's indictment alleged that he "did *willfully, unlawfully, purposefully and feloniously* commit an aggravated assault by attempting to cause or causing bodily injury to Erica . . . with a deadly weapon or other means likely to produce death or serious bodily harm . . . in violation of Section 97-3-7(4)(a)(ii) . . . ." (Emphasis added). The statute reads that "a person is guilty of aggravated domestic violence who . . . [a]ttempts to cause or *purposely or knowingly* causes bodily injury to another with a deadly weapon. . . ." (Emphasis added).[5]

¶36. First, Roberts claims his indictment was constructively amended by the giving of the State's general intent jury instruction, because it allowed the jury to convict him under a degree of intent lower than that described in the indictment of "willfully, unlawfully,

---

[5] Roberts correctly states that the indictment would not allow him to be convicted under the lesser "reckless" standard of section 97-3-7(a)(i) (allowing the defendant to be convicted when he acts "recklessly under circumstances manifesting extreme indifference to the value of human life").

purposefully, and feloniously." We do not agree.

¶37. Roberts equates the indictment's terms of "willfully, unlawfully, purposefully and feloniously" with a higher degree of intent than general intent. However, this is not the case. Specifically, the term "willfully," as discussed in *Johnson*, when used in a statute, does not necessarily establish that a crime is one of specific intent. *See Johnson*, 44 So. 3d at 406 (¶¶17-18). There, we found the term indicated a general intent crime for shooting into a dwelling. *Id.* at (¶12). "The term 'willfully,' without more, indicates the person intended to do the unlawful bodily movements. . . ." *Id*. Here, we are discussing the term as used in the indictment, which charged Roberts with a general intent crime. The indictment's use of these terms, while not identical to the statutory terms, did not change the intent of the crime from general to specific. Therefore, it follows that the jury instruction on general intent did not broaden the grounds for conviction from specific to general intent.

¶38. Second, Roberts argues that the State's closing argument constructively amended the indictment from aggravated domestic violence to aggravated assault when the prosecutor stated, after discussing the crime's intent: "But the law for *aggravated assault* simply requires that a person know the actions in which they are doing. Doesn't require him to intend . . . any particular result." (Emphasis added). Roberts made no objection to the argument at trial but now contends that the prosecutor's telling the jury that pulling the trigger of the gun alone would allow the jury to convict him constructively amended the indictment by charging him with an entirely different crime—aggravated assault, a general intent crime—instead of aggravated domestic violence, which he contends is a specific

16

intent crime. We disagree for the same reasons stated in the first issue. For aggravated domestic violence, the criminal act is all that is required against the domestic victim.

¶39. We fail to understand how Roberts's indictment was constructively amended to aggravated assault by the State's jury instruction or closing argument. Roberts cites *Bell v. State*, 287 So. 3d 944 (Miss. Ct. App. 2019), as instructive. In *Bell*, the defendant was indicted under the aggravated domestic violence statute for Count II, charging him with "attempting to cause or purposely or knowingly causing serious bodily injury to [the domestic victim] with a deadly weapon or other means likely to produce death or serious bodily harm . . . ." *Id.* at 953 (¶16). However, the subsection of the statute does not require "*serious* bodily injury . . . with a deadly weapon"—only "bodily injury." *Id.* at 954 (¶16). At trial, after both sides rested, the State moved to amend the indictment to remove the word "serious" as "surplusage." Over objection, the trial court granted the motion. *Id.* at (¶17). On appeal, the defendant claimed error, and we agreed, finding the trial court erred in amending the indictment for two reasons: its timing and impairing Bell's defense. *Id.* at 955 (¶22). Because the indictment was amended after both sides rested, the defendant had no opportunity to adapt his defense to the amended indictment. *Id.* at 954-55 (¶20). The amendment "materially changed the allegations [in the indictment] after the evidence was closed." *Id.* at 955 (¶22). Second, Bell's defense was impaired because the amendment "completely eliminated a meritorious defense" under the original indictment because at trial the defense had questioned the prosecution's witnesses about the seriousness of the alleged knife wounds. *Id.* at (¶¶21-22). As a result, we reversed and rendered the defendant's

17

conviction for Count II. *Id.* at 956 (¶27).

¶40. Roberts argues that *Bell* supports his constructive amendment arguments related to late timing and the impairment of his defense. Roberts claims that both the State's jury instruction and closing arguments, which he alleges lowered the burden of proof and "redefin[ed]" the crime to one of aggravated assault, were completed after the evidence closed, like in *Bell*. Thus, Roberts could not prepare a proper defense. Further, Roberts contends his defense that the shooting was an accident was impaired, but with the lower standard of proof created by the jury instruction and the State's closing arguments, it was "eviscerated."

¶41. *Bell* is distinguishable from this case. *Bell* dealt with the propriety of an actual, not a constructive, amendment to the indictment, which calls for a different standard. "Amendments to an indictment are permissible if they do not prejudice the defendant by (1) materially altering the essential facts of the offense or (2) materially altering a defense under the original indictment." *Bell*, 287 So. 3d at 954 (¶18) (citing *Lee v. State*, 944 So. 2d 35, 40 (¶16) (Miss. 2006)). In addition, *Bell* applied a further test for analyzing an indictment's amendment in order to remove surplusage.[6] *Id.* In contrast, here, the standard for whether

---

[6] *Bell* referenced the supreme court's statement in *Lee* on surplusage:

(1) The removal of the surplusage must not change the substance of the offense charged; (2) the defendant must be afforded a fair opportunity to present a defense and must not be unfairly surprised; (3) the removal of the surplusage must not materially alter the essential facts of the offense; and (4) the removal of the surplusage must not alter a defense under the original indictment.

*Bell*, 287 So. 3d at 954 (¶18) (quoting *Lee*, 944 So. 2d at 40 (¶16)).

an indictment is constructively amended is "when the proof and instructions broaden the grounds upon which the defendant may be found guilty of the offense charged so that the defendant may be convicted without proof of the elements alleged by the grand jury in its indictment." *Bell*, 725 So. 2d at 855 (¶58). Here, there was no language that would have lessened the degree of harm required to convict the defendant. The rules cited and analysis in *Bell* is not applicable to this case.

¶42. Roberts knew he was indicted for aggravated domestic violence. Defense counsel's examination of witnesses and arguments before the bench show he was aware of the crime charged. He was able to prepare properly for his defense. Jury Instruction Number 7 correctly stated the law on general intent regarding the crime charged in Roberts's indictment. Neither the jury instruction nor the State's closing arguments constructively amended his indictment.

## CONCLUSION

¶43. The trial court did not err in giving Jury Instruction Number 7 on general intent as it relates to aggravated domestic violence. The instruction was a proper statement of law and did not render Roberts's trial fundamentally unfair. Further, Roberts's indictment was not constructively amended. Therefore, we affirm his conviction and sentence.

¶44. **AFFIRMED.**

**CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

19